## JOHNSON et al. v. KING-RICHARDSON CO. et al.

District Court, D. Massachusetts. September 17, 1928.

No. 1884.

Allen, Abbot & Packer and Edwin H. Abbot, Jr., all of Boston, and Julian C. Risk, of Chicago, Ill., for plaintiffs.

Joseph B. Ely, of Springfield, Mass., for defendants.

MORTON, District Judge. The master's findings of fact are accepted by both parties, although certain of his conclusions and rulings are excepted to. I shall refer only to such facts as bear on the decisive question.

The present bill was brought on January 2, 1924, by Johnson, Branch, and Rudin against the King-Richardson Company and Nevins. Branch was not then a stockholder, having disposed of all his interest in the 10 shares standing in his name. Johnson was a substantial stockholder, owning 123 shares. In this matter, however, he acted only at the request of Rudin, who agreed with him to bear all expenses of the litigation. Rudin is the active plaintiff; he owned 20 shares. The defendant Nevins was the principal stockholder, owning 325 shares out of 500, and was the active manager of the King-Richardson Company.

Beside being a stockholder, Rudin had for a number of years been the exclusive agent for the sale of the defendant company's books in a large territory; his offices being in Chicago. He dealt with the company under a written contract whereby the books were furnished to him at a very large discount, and he sold them on his own account and risk. The only other sales agent of the company was Sawhill, at Springfield, Mass. Its entire output was disposed of through these two channels. In 1920 the King-Richardson Company proposed to increase the price of its books to Rudin and Sawhill. They objected strenuously, coming to Springfield and having many interviews with Nevins about the matter. When negotiations had apparently failed, they prepared a minority stockholders' bill, setting up substantially the same grievances as the present one. They threatened Nevins with it, and the negotiations were resumed. The result was that the King-Richardson Company made a price on the books acceptable to Rudin and Sawhill, which was embodied in a three-year contract, and they withdrew their objections as stockholders to Nevins' management of the company. Johnson was a party to the proceedings. His only interest was as a stockholder, and he withdrew his objections to Nevins' management on receiving an agreement from Nevins that certain specified dividends should be paid. All the important items of the present controversy were then subjects of dispute, and were, as the master finds, settled and disposed of by Rudin and Johnson. In connection with this settlement, Nevins gave Rudin an option on the former's stock, to remain open until July, 1922.

Early in 1922 Rudin conceived the idea of getting up a set of books along the same line as those of the King-Richardson Company, and of putting them on the market in place of the King-Richardson Company's publication. Sawhill acted with him in the matter. In pursuance of this plan they called for large deliveries of books from the defendant company in 1922—much more than could be sold by them in that year. Their object in so doing was to have enough of these books on hand to keep their business going until their own books were ready for sale. Rudin then formulated systematic plans for ruining the King-Richardson Company, in order to prevent it from competing with his new book. He employed the authors of the King-Richardson books to prepare his competing work, and he suggested to them that they were owners of the copyright of the King-Richardson Company book, and were in a position to prevent further sales of it. The master finds that "shortly after contracting for his new book, in August, 1922, Rudin began to attempt to eliminate 'The Bible Story' as a competitive work." In October, 1922, he wrote Dr. Hall, one of the authors of "The Bible Story," and one of the men employed by him to write "The Book of Life":

"I am inclosing herewith an opinion by my brother on your and Professor Wood's contract, which, in substance, holds that the contract which you made with Mr. King originally, to which, of course, the King-Richardson Company succeeded by assignment from him, is purely a printing and selling right; that you and Professor Wood retain your rights as authors, and that you can by notice to the King-Richardson Company terminate as to their right to further print and sell The Bible Story at any time.

"I also inclose a copy of your original contract as it was delivered to me some years ago, by either Mr. Nevins or Mr. Johnson. I wish you would submit this to your attorney, together with my brother's opinion, and if he agrees with you, of course, you can absolutely block Mr. Nevins' sale of his interests with the King-Richardson Company, because, as you know, the only value is in the right of *The Bible Story*. Further, if that is the situation, we can be saved a tremendous lot of work in the building of our new set. We have a right to use any portion of it, and to prevent the further sale of *Bible Story*, thus eliminating it as a competitor, and eliminating the King-Richardson Company as well, because it will have nothing to exist for, as no one will buy out

194

the stock without the right to sell, and publish and to own *The Bible Story*. At least it will give you control of the situation and enable you to say to whom *Bible Story* shall be sold, or to say that it shall not be sold at all after the new work out.

"Kindly let me hear from you on this."

On October 28, 1922, Rudin again wrote to Dr. Hall as follows:

"I shall be interested to know what your attorney's opinion is, and whether it accords with that of my brother, who positively states that you never in that contract parted with your rights as author, and that you can by written notice terminate the rights of the King-Richardson Company to further print or sell *The Bible Story*. If that be true, then, Dr. Hall, you can use any part of the first *Bible Story* in the new work, and can absolutely, if you wish to, block any sale by Mr. Nevins of his stock and can have it at pretty nearly your own figure. This would be a good thing. If we could buy out the King-Richardson Company, at a reasonable figure, getting with the *Bible Story* plates, then *you* could determine what you would do with *The Bible Story;* whether you would take it off the market altogether, as a competitor to our new work, or whether we could make some special contract with you and Dr. Wood in regard to it.

"Of course, the thing to do is for you to make no agreement with Mr. Nevins, which would not fully protect all rights you have in *The Bible Story*, and especially to prevent any tampering of your rights in the future. Because, after all, where our interests lie, in the new *Bible Story* and in the new Encyclopedia, it would by all means be the best if we could get *The Bible Story* off the market as soon as we have our new one ready to put on.

"I know the effect that would have upon Mr. Nevins' stock, and upon the value of K.-R. Company; practically reducing that to zero! I would be affected along with other K.-R. stockholders, but I would willingly sacrifice whatever I have to go on with the new work and to leave our future unhampered and unharassed! I don't want you to take any action, of course, that will mean any loss to you and Professor Wood on the old set. I simply ask that you do not put into Mr. Nevins' hands, or to any successor to him, the power to hamper us."

The learned gentlemen fell in with Rudin's plan and brought suit against the King-Richardson Company and Nevins to establish their title to the copyrights—a proceeding which is still pending in the state court.

While the master does not find in explicit terms that the present suit was brought in bad faith and for the purpose of further embarrassing and ruining the King-Richardson Company, his findings, especially when taken in connection with Rudin's letters, leave no doubt that such is the fact. Rudin is not undertaking the heavy expenses which this litigation has involved simply to protect his interest as the owner of 20 shares in the King-Richardson Company. His letters made clear what his real interest is. He is using his position as a stockholder in the King-Richardson Company to bring suit against it, not in order to protect the interests of the stockholders, but in order, as he said in his letter to Dr. Hall, to make the stock valueless, and to put the King-Richardson Company out of business, so that he may be free from its competition in selling his own book. Rudin's plan succeeded, and the King-Richardson Company has been forced out of business.

It is evident, I think, from this summary of the facts, that the offices of this court have been grossly abused. The strong and persuasive reasons which have led courts of equity to turn an attentive ear to complaints by minority stockholders of oppression and fraud by the majority do not exist in this case. The process of the court has not been invoked in good faith, to redress wrongs honestly believed to exist, but rather as an instrument of the most unfair and unjustifiable oppression. I entirely agree with the statement of Lord Westbury in Forrest v. Manchester, S. & L. Ry. Co., 4 De G., F. & J. 126:

"It has been a very wholesome doctrine of this court that one shareholder, having in view the legitimate purposes of the company, may be permitted in this court to maintain a suit on behalf of himself and the other shareholders of the company, but the principle upon which that constructive representation of the shareholders is permitted indisputably requires that the suit shall be a bona fide one, faithfully, truthfully, sincerely directed to the benefit and the interests of those shareholders whom the plaintiff claims a right to represent. But can I permit a man who is the puppet of another company to represent the shareholders of the company against whom he desires to establish the interests and benefits of a rival scheme? That would be entirely contrary to the principle upon which this constructive representation has been permitted to be founded. When the plaintiff sues in that capacity any personal exception to the plain-

tiff remains, and it would be in direct contradiction of every principle of truth and justice if I permitted a man to come here clothed in the garb of a shareholder of company A, but who is in reality a shareholder in company B, and has no sympathy whatever with, no real purpose of promoting the interests of, the other company. Such a thing would be so much at variance with the principles of a court of equity that it would be impossible for it to entertain a suit of that description which is a mere mockery, a mere illusory proceeding."

Rudin in this case is not even acting for a rival company. He is himself the rival, and is using his position as stockholder to further his own personal business at the expense of the King-Richardson Company. Johnson is a mere stool pigeon of Rudin, having lent himself in his character as stockholder to Rudin.

It is said for the plaintiffs that the bill should be sustained in the interest of other stockholders, not affected by the misconduct of the present plaintiffs, nor by the settlement which they made, and the master so ruled. I am unable to agree with him. The foundation of such a proceeding as this is a bill honestly brought, as Lord Westbury says. Without it there is nothing which the court ought to notice. It will be time enough to scrutinize Nevins' conduct when some stockholder in good faith requests such action.

As the master has found no fraud by Nevins in the management of the King-Richardson Company, I am quite unable to see why he is not entitled to interest on the large sums which from time to time he advanced to the company. It is certainly the general business custom to charge interest under such circumstances. It is an extreme —and I think an ill-founded—technicality to hold that Nevins lost the right to it by putting the company's obligation to him into the form of a demand note, when his contemporaneous conduct clearly shows that he understood the loan to carry interest. A demand note may be regarded as due from day to day, and this one to have been continued along upon the condition that interest was paid, which is no doubt the true fact.

A decree may be entered, confirming the master's findings of facts, but not his rulings and conclusions thereon, as they are immaterial, if upon the facts the bill ought to be dismissed; and a final decree may be entered, dismissing the bill, with costs. As the suit seemed to me wholly unjustifiable, I should be inclined to allow costs as between solicitor and client, if I have the power to do so. If the defendants move for such costs, I will hear parties on that question.